Let's hear the first case, United States v. Karow, Mr. Risenstein. My name is Philip Risenstein on behalf of Dr. Herman Diehl. May it please the court and counsel for the government, again, my name is Phil Risenstein on behalf of Dr. Herman Diehl, and listening to your admonition, getting straight to the heart of the matter, Dr. Diehl found himself being prosecuted. And make no mistake, based on only one theory by the government, and one theory only, and that was the fact that he did not wholly own a clinic that was licensed in the state of Florida. And to the heart of the matter, our argument in this case is that the prosecution, the conviction, represents nothing less than prosecutors legislating and criminalizing conduct that the state of Florida has not done and has not spoken on. And this record is replete, really, with personal opinions based on my cross-examination of the agent in the case, where when Dr. Diehl has 100% ownership of a stock of the company and can open it, as they agreed, can close it, they agreed, I think I flippantly uncross that he could have turned the clinic into a Taco Bell and they agreed, and I said then he only owned it. And basically, their answer is no. And the reason why I say the government's entire case is the linchpin on this is because the government knew going into this case that the answers of their co-conspirators who were cooperators were going to be that this conspiracy to have fake accidents and fake patients was hidden from Dr. Diehl. And therefore, their argument as to his guilt was only that because this clinic wasn't licensed, it didn't matter what he did. It didn't matter if he saw every patient and it didn't matter how he handled them. He was guilty of fraud. And what concerns me now today is that his conduct is lumped in with everyone else's, with other doctors that he had no knowledge of and didn't work with. When at trial, I was the only attorney that put in medical records of any doctor and that's my client's doctor's records. And all of them show that unlike anybody else, he did not meet the government's allegations of this fraud PIP conspiracy to issue prescriptions that were designed to maximize PIP. They had this— I'd like to talk about that wholly owned issue. Yes, sir. So, is that a question of fact, and if so, is the government right that there was evidence that he didn't, in fact, own the business because he didn't pay for it, didn't earn money when he sold it, did not share in the profits, and called himself a puppy owner or owner on paper? Well, what I'm saying that that is doing is in the absence of Florida defining what wholly owned is, that is criminalizing conduct based on personal opinion. They put an expert on the witness stand, Ronald Jones, and he said, here's what wholly owned means, and he took it from a separate part of the Florida statutes. And what he basically said was, is you have to be involved in the day-to-day business, you have to do the marketing, you have to do the payroll. And my response is, woe to be a physician that spends 40 or 50 or 60 hours in an operating room. Did you ask for any kind of instruction by the judge to define wholly owned? Well, what occurred, Your Honor, was that I had always been very concerned about this issue, and a case from this court in a civil context came down, a Silver Star case, that listed some of the definitions that Judge Pryor spoke about. But I brought that to the court's attention. But my position is, that's a civil case dealing with a Florida civil statute. I understand. I'm just asking, did you ask for an instruction asking the judge in some way to define it or to say, it's up to the jury to decide the law, which sounds bad, so that's why I'm asking, did you address this point? The answer to the question is, based on my recollection, although I brought the Silver Star jury instruction to the court, I objected to it based on the fact it was a civil case. My red light's up. I don't believe, based on my knowledge, that I asked for a particular instruction. Thank you. Thank you. Okay. Yes. Ms. Goldie. Good morning, Your Honor, fellow counsel. I'm going to address, initially, some jury instructions I did request. The first one is a jury instruction that I think impacts all defense attorneys throughout this circuit and probably throughout the country, and that is dealing with the issue of the to record interviews of targets and defendants. In this case, I asked for a cautionary instruction, not an instruction saying there was anything wrong with what the government did or saying that it was improper. I asked for an instruction, actually, that was very similar to what we give in the case of confidential informants, just cautioning the jury that when such things happen, what you're really hearing is an agent's impression or interpretation of what the client said and not what the client actually said, and therefore, it should be viewed with more caution because what happens in these cases is the government puts an agent on the stand, and no matter what we do, even if we put our client on the stand to say that's not really what I said or what I meant, they're going to believe the agent over the defendant. The first thing they say is the agent has no interest in the outcome. The district court, did it not, instructed the jury that you must consider the evidence, the government's evidence, with caution and great care. You must decide for yourself whether the defendant made the statement, and two, if so, how much weight to give it. It was that, in fact, an instruction the district court gave, and if so, why didn't that exactly cover the substance of what you wanted? I don't remember the district court giving that instruction. I'm looking at the record 1759 colon 142. Okay. Now, I understand your proposed instruction was to give these interviews more scrutiny, Right. but, and I understand the district court didn't give that instruction, but my concern is whether the instruction that it did give basically covered the substance so that there's no error. I don't believe it did, because that instruction I think that you're referring to is just a general instruction overall, and it doesn't focus on the failure to record. What we're dealing with here is an agent's testimony about what a defendant said, and that, I believe, requires special scrutiny, requires special treatment, because the government repeatedly just refuses to record, and the times when we do get recordings, very often they differ substantially from the agent's interpretation of what was said in the reports. I mean, there can be major differences when we do have recordings, and usually that happens when there's state agencies involved, because they do record, and there should be no harm in recording. We should encourage it. That is the best evidence, and so I'm not asking the court to exclude evidence just because they didn't record it, but I think we should be entitled to a special cautionary instruction, something that would encourage them to record, so that the defendant has a fair trial on these issues. The other general instruction that the court refused to give is my theory of the defense instruction, and that dealt with some of the issues that Mr. Reisenstein discussed, which is basically the management issues, and my instruction asked the court basically to tell the jury that the doctor may not have managed the business the way he should have. He may not have directed his employees the way he should have, but that does not mean he was part of the fraud. In Dr. Caro's case, I have government witness after government witness after government witness saying, my client did not know about the fraud. They hid it from him. They purposely didn't tell him. You have one star government witness saying, I never said the doctor knew what was happening in the clinic. I made sure he didn't know it, and despite all of that, the court refused to give an instruction saying, just because his employees committed fraud, you know, he's not responsible, and the government kept arguing basically a Pinkerton theory, saying that he's responsible through Pinkerton or other vicarious liability theories because his employees did these things. I've gone beyond my time. Yes, you are. I'll bet you'll save a minute for rebuttal. Mr. Clute. Good morning. I want to focus on the sufficiency issue. We basically argued that there was no substantial evidence of fraud conspiracy or fraud substantive by Mr. Cripe, Dr. Cripeman, and there was no evidence at all of him joining a money laundering conspiracy or committing any substantive money laundering offenses. I want to focus first on the lack of substantial evidence on the fraud conspiracy. Like as similar to other of the doctors, it was clear that there was the most intense part of this conspiracy was doing things that would not reveal to the chiropractor that there was any kind of fraud going on, much less that there was this elaborate, what the government calls sophisticated, staged accident fraud. And again, the government doesn't dispute that there were accidents. People were in accidents. And they did, when they went to the doctor, they did know the right soft injury claims to make. And that these types, that they're not saying that doctors could by physical examination have disproved them. What they're saying is that somehow his other miscellaneous and really anomalous conduct by Dr. Cripeman somehow shows that he knows either he's not a good doctor or he knows something's wrong. By miscellaneous and anomalous conduct, you mean signing forms and this sort of thing? Yes, in 0.001% of them, he may have signed one or two forms ahead of time. Again, there was never any precision on this. And it has nothing to do with the conspiracy. Dr. Cripeman was the one who had actually spoken with the agents early on, right? Yes, he spoke two years after he left. Again, how does he leave? Why is he fired by them? Because they say he wants to spend too much time taking care of the patients. That's the actual communication. I wanted to ask you before you finished a record question on the money laundering aspect, which is that basically that comes down to his receipt of two checks. Am I right? One is this $250 for a half day's work at 36 rehab and $500 for a Christmas bonus? Yes, both checks are in the name of the companies. One check is made out to the bigger check is made out in his name. The little check is made out to cash. I suppose that's their issue. But he gets checks all the time. This is how – that's not money laundering. First of all, it's not money laundering by anybody. Because if it was, it would only be somehow under one of the three theories that they argued. But it's not even – usually you don't even charge somebody giving a payment to somebody else in the conspiracy as promotional money laundering. I don't know that they've cited a case for that. And this is just – and that's from the people who are giving the check. But for the receiver of the check, it's all backwards. It's not a legitimate basis for charging either substance. So as I understand it, their argument is that the payment – those payments represented proceeds intending to keep him prescribing the requisite amounts of therapy so that that personal insurance protection could be built. And they failed on every proof element there, even if that theory holds up. And it doesn't hold up in the case law. You could say that about two drug dealers do a deal. One guy takes the money. He hands half of the money to the other guy. That's not a money laundering offense. That's not – it really is not even a proceeds under Santos. Santos, in the Supreme Court, talked about this multiplication of offenses. This is a classic example. I mean, this is – if they had a case at all. But this is one anomalous check from the company. How is the company hiding the fact he's cashing? He signs the name on the back of the check. I mean, it's – so it's clearly the promotion is – the promotion theory does not apply to him. He is not promoting. He is not conspiring to promote. He is receiving. Okay. I think we understand your argument. You'll save your two minutes for rebuttal, Mr. Kluge. Ms. Villafana. Good morning, Your Honors.  May it please the Court. The defendants have each sought to narrow the scope of the charged conspiracy so that they can each argue that their actions fell outside of it. And we saw that today with Mr. Creighton saying – Mr. Creighton's counsel saying that this was a staged accident conspiracy. And because he was not involved in staged accidents, he was not part of the conspiracy. This was a conspiracy to defraud insurance companies. And there were six manners and means that were charged in the indictment that relate to how that fraud scheme could work. This was a very complex and sophisticated scheme involving recruiting doctors to pretend to be the true owners of clinics so that they could avoid the licensing restrictions of the state of Florida. It did involve staging accidents. And mostly it involved providing false forms to insurance companies in order to get the money that they could use to continue to fund their scheme and to profit for themselves. With regard to Dr. Deal's argument regarding the rule of lenity, if you take Dr. Deal's argument to its logical extreme, no one could ever be prosecuted or found to have violated that particular statute, that particular Florida statute, because wholly owned is not defined. Isn't he really saying that the common use of wholly owned would be, corporation, I own 100% of the stock, I normally wholly own it. I don't think they're saying it's never adequate. But in this case, he meets what seems to be the first definition. That's kind of why I was pressing him on his side, whether he had asked for an instruction to that effect. But nevertheless, he's not saying that it's so vague that nobody could ever violate it, I don't think. Well, I think what he's saying is, let me first address the issue of the instruction. And I apologize that I don't have a copy of my response here. Dr. Deal filed a motion for bond pending appeal. And part of that was that the jury instruction, because there was a theory of defense instruction regarding wholly owned, was objectionable. And in my response, I noted that Ms. Golder, when she asked for that instruction, which the court adopted, said she was asking for it because Mr. Reisenstein had asked her to ask for it. Okay, let me ask you one other thing on this general area. Just now and in your brief, you said, well, there's six manners and means that were used. But correct me if I'm wrong, as a general matter, if you don't have a special verdict, and you say, well, the jury could have convicted on different theories, and one of them is bad for some reason, substantive, procedural, or otherwise, then generally the verdict can't stand because you don't know which of the theories they convicted on. Am I right as a general principle? And if not, why not, and why wouldn't it apply here, assuming that we agreed with him on the point he raises? That is, why do the other five means save you? Okay, well, first of all, the 11th Circuit has held that the manner and means is actually surplusage. You need to look at what the object of the conspiracy was. And the object of the conspiracy was to defraud insurance companies in order to unlawfully enrich themselves by submitting false claims for insurance benefits. That is the scheme that was charged. That is the scheme that the jury convicted of. And with going back to the wholly owned issue, while certainly Mr. Reisenstein made much of this ownership of the stock, the true facts were, and there was testimony from Maria Testa as well as from Luis Yvonne Hernandez, Mr. Diehl never really purchased that stock, never really sold that stock. There was no money that ever changed hands. All of these bills of sale were false, and Dr. Diehl knew that they would be submitted to the Florida Agency for Healthcare Administration in order to get a certificate of exemption. Those false documents were mailed to ACCA. ACCA, in return, mailed back the certificate of exemption, and those certificates of exemption were submitted with every single bill to the insurance companies through the mail. In addition, Dr. Diehl committed other types of fraud. Now, Mr. Reisenstein said that Dr. Diehl is the one doctor who didn't follow the procedure for billing the maximum amount. But the testimony was, and the claims files,  show that, for example, his Exhibit No. 1, 45 treatments were ordered and billed. Diehl Exhibit No. 2, 46 treatments were billed. Diehl 3, 49 treatments were billed. All of them were in excess of 40. So he did, in fact, maximize the PIP, as they said, at the various clinics. With regard to your other question about whether wholly owned is a question of fact, I believe it is a question of fact, and I believe that the jury found that he did not wholly own the clinics or the stock, for that matter. I could at least recount what evidence you say supports that, if it is a question of fact. The items that you mentioned. He didn't actually own any of the items that were inside the clinic. He didn't invest any money into opening the clinic. Didn't buy it, sell it. Didn't buy it, didn't sell it. Luis Ivan Hernandez... He referred to himself as a puppy owner or owner on paper. Exactly. Yeah. He was paid... How did that evidence come in? The puppy owner came in through the statement that was made to Special Agent Stewart, where Dr. Diehl repeatedly said that he knew he wasn't the true owner. And the witnesses testified that he was paid a weekly salary to be the owner and to see patients. There also were... There was testimony in Mr. Diehl's own statement that there were instances when he did not see patients or he backdated forms so that the billings would be covered, meaning the treatment sessions. He said that he knew they were putting up a front for him so that he wouldn't realize that patients were not getting treatment. And in each instance for all three of the doctors, there was evidence that it was mathematically impossible for all of the treatments that were billed to actually have been rendered, because there were only two licensed massage therapists at each location. The prescribed treatment and the treatment that was billed was an hour to an hour and a half in length, and it was simply mathematically impossible for everyone to have done that treatment. Um...I want to talk about the failure to record interviews. The actual instruction that was given, and it was given... Was I reading the right one? You were, Your Honor. But if you continue with what you read, it actually says, you must decide how much weight to give to it. To make those decisions, you must consider all of the evidence about the statement, including the circumstances under which it was made, which would go to this issue of, was it recorded, and are the agents telling the truth about what was said? Did they argue to the jury that this undermined the agent's testimony? Absolutely, Your Honor. There was extensive... I mean, there were hours of cross-examination about the failure to record, and about the fact that... It was argued in closing argument, too. Yes, Your Honor. And part of the argument was, you're only hearing one version of the facts. You're hearing the agent's interpretations of what happened. With regard to Mr. Kreitman and the sufficiency issue, this idea that he may have signed forms falsely .001% of the time is completely belied by the testimony. There was testimony from Yanet Hernandez, from, um... Yulia Tapanes. I'm sorry, there's too many Ys in this case. Yanis Lady, um... Yanis Lady Ramos, as well as Nelson Martinez and Maria Testa, all of them talking about him signing forms without seeing the patients, because he was in a hurry, because he didn't want to wait for them. One patient had left and returned to Cuba. There were just so many instances.  And, um... Mr. Kreitman also, of course, made a statement to the agents that he knew that patients were coming to the clinic, they were going behind closed doors with Maria Testa, and he believed that Maria Testa was coaching them and was paying them for coming. What about the promotion money laundering? Are those two checks I mentioned all you have to support that? And if so, do they support that? Your Honor, we did have testimony from one witness about Mr. Kreitman being paid in cash on occasion. But other than that, the two checks are the only checks that were written directly to him from those particular... from Universal Rehab. And, Your Honor, there is case law that says that paying someone... Distributing proceeds and using proceeds to facilitate the illegal enterprise promotes the SUA. In U.S. v. Kelly, monthly dividend payments that were given gave the principals an incentive to continue their activities despite the risks inherent in such activity. And U.S. v. Arthur was distributing proceeds to Confederates who would not continue to participate in the scheme unless paid promotes the growth, enlargement, and prosperity of the scheme. There's also the case of U.S. v. Lawrence from the Tenth Circuit, which said that using the proceeds of Medicare fraud to pay a doctor whose participation was essential to the scheme and to keep the doors... the doors of the clinic open promoted the scheme. But in each of... at least as you were quoting them, and correct me if I'm wrong, it sounds like they're talking about distribution from a money launderer, whereas if I understand this, it's distribution to the money launderer. No, these were... these were... the Lawrence case was the doctor. The doctor was complaining that... exactly like this. And actually, all of these were cases where it was the recipient of the proceeds who was saying, well, that's not money laundering. I'm just getting... The quotes just sounded funny, but if you say that's what they say, we'll look at it. But, you know, I think if you look at it from a different perspective, which... because here, of course, the doctors... part of the scheme was making it appear legitimate. So they were on the payroll. If you think about, for example, the people who were staging the accidents, they received money from... that derived from proceeds of earlier accidents, and they received their payment, which in essence was their salary. Um, it was a payment to continue coming to the clinic so that it appears that they're really getting treatment. It's payments to continue signing. Were some of those clients convicted of money laundering? They were, Your Honor. They were, Your Honor. Um, and so everybody would say, well, obviously that's money laundering, but I think because the defendants have captioned themselves as legitimate employees, um, they're trying to avoid these cases that are... that are pretty clear. And Maria test... testified that she gave Mr. Kreitman the checks so that he would continue prescribing. Um, I think those were all the issues that were raised by the defendants. Um, does the court have any further questions? One thing I thought was interesting about the arguments across the board from the defendants was they can all point to witnesses who said they had no knowledge of the conspiracy. Just on that knowledge of the conspiracy issue, what's the... best evidence the government presented to the contrary? Well, Your Honor, I think, um, there's a few things. For example, with regard to Dr. Caro, um, is I think he's one of the people that hit on this very hard. Um, there were statements... and you have to look at all of the circumstances of the case. For example, in all of the clinics, um, there was... there were not enough LMTs to actually do the therapy that was being prescribed and that was being billed. Um, there was testimony from... that all of these doctors spent, say, five to ten to... the maximum was 20 minutes with a patient. They were billing for 45-minute, um, uh, treatments. All of them expressed either to an agent or to another person feelings that people were, um, were exaggerating their symptoms. And if you look at, for example, with Dr. Caro, if you look at the prescriptions, they all received the same prescription protocol five times a week for two weeks, four times a week for four weeks, and then three times a week for four weeks. So that when you look at... I think it's Government Exhibit 77, which lists the number of therapies that were prescribed for each person, you see identity. Um, and that's what I did with, um, Dr. Diehl's prescriptions as well, where it ends up that they're all the same. Um... This is some kind of conscious parallelism? Is that... is that the theory? Your Honor, it's... it is the theory. It's the theory that their goal was to maximize the PIP, and that's what they all talked about. They all talked about which insurance companies were the best. Um, Dr. Caro was meeting with Vladimir Lopez, um, at his clinics, which everybody acknowledges was the mastermind of the scheme. He's the person that did speak English. Um, Dr. Diehl was, um, was writing prescriptions that say, continue therapy, but then he argued, well, I never agreed to the therapy even though all of the therapy sheets were put in the file before he returned. Um, and the therapy sheets actually showed two times a week for... four times a week for two weeks, et cetera. So all of these resulted in billings that were, for Dr. Diehl, the charts that he mentioned, over $20,000. Um, and those are... and that really shows this... this plan. Thank you. Um... Your time has expired. Mr. Eisenstein. Thank you. Dr. Diehl's prescriptions completely vindicate him. He wrote in prescriptions things like, this person was injured at work, which wouldn't allow for PIP. He ordered therapy sometimes three or four times and that was it. And when the... what the government has done is conflagrate billing versus prescriptions because when you see my cross-examination of Testa and Hernandez and I said, how is it that he only wrote a prescription for three or four therapies? Well, we billed them all. And therein lies the problem in the matter. That's why Dr. Diehl is in fact innocent because when you see what he prescribed, yes, as she said, they billed, they billed, they billed. But then here's the next question to them. Did he know you were doing that? No. Did he know about your conspiracy? No. So what we have here, and that's why I put these in, are prescriptions that vindicate him, vindicate him from a conspiracy that was hidden from him. And one last thing. When they talk about the bill of sale and they talk about the ACA exemptions, their own witnesses said, this was all voluntary. Florida law doesn't require it. So all of the facts that they have just said in my reply brief about what Dr. Diehl said... Florida law doesn't require what's the it there. Okay. Doesn't require the actual filing of the exemption and it is called it's voluntary and was self-done. So how can that be a fraud? My reply brief has a response to the government's assertion of facts which we've said are not supported by the record, some of which were said today about Dr. Diehl's statements and knowledge. Thank you. Thank you, Mr. Eisenstein. Ms. Golder, I'm sorry. I wasn't wearing my reading glasses earlier when I said Goldie. It's always odd. Golder, Golden, Goldner, whatever. Ms. Golder, I'm sorry. That's quite all right, Judge. Let me just make a couple of points to Dr. Caro because I think each of these doctors is in a unique position. When you start looking at the arguments and of course I have adopted Mr. Eisenstein's argument, Dr. Caro did declare these companies on his tax returns. He paid taxes on the net profits on these returns. In fact, sometimes to his detriment it caused him some tax issues. When he found out about wrongdoing, he closed the companies. He was involved in some of the hiring of people in these companies. So when you talk about Dr. Caro, they made this argument that he was some sort of straw owner but in fact he has all the indicia of ownership. Just because he didn't manage the companies doesn't mean he didn't own them and that was a big distinction I made at trial and it would be a horrible thing to tell a business person that they can't buy a company and hire somebody to run it because they have multiple companies and obviously they have multiple managers and CEOs running those various companies. I think that's the way of business and the way of the world and that's what Dr. Caro did here. So those kinds of theories don't apply to him. Thank you, Ms. Goldrum. Mr. Clayton,    I didn't hear a percent from the government. They said just 0.001%. I said 0.001%. I didn't hear a percent from the government. Just so many and I always like that when I give a number. Give me another number. Is it 0.002%? What's the number? Just so many but there's just so many of things that don't matter to this conspiracy. Those just so many things whether it's 0.01 or 0.2 have nothing to do with this conspiracy. They do not. That's what the conspirators don't want. The reason they're paying him is to go there and see these people. The very few instances they're talking about they cite three witnesses I believe, two or three witnesses. The one witness says well, was it one time? I don't know. It was maybe the final visit. This is the sign-off visit where the patient comes in and says I'm fine. I don't need any more treatment anymore. It's not even clear that that was billed. If that's their theory and I think that's what's left of their brief because we debunked everything else in the reply brief. If that's what's left that's not substantial. I don't know what number they want to pick to make it substantial but it's not substantial because it's not part of the conspiracy. It's counter-conspiracy which is the key point here. Now, they talk about they don't deal with him being a part-time employee. He's not just he's just somebody who comes in to do a function. He doesn't even get paid by these people. That's why they focus on these two little checks that come in because it's an offhand thing. He's supposed to be part of a money laundering conspiracy when he's a part-time employee that's not even paid by these people. I mean, why aren't they charging the checks that the company that pays him the temp company that pays him? If they want to proceed on the statement they should have proceeded on a deliberate ignorance theory because that's the best you can get out of the statement and it's a post hoc deliberate ignorance theory but they didn't ask for deliberate ignorance instruction. Instead, they went forward as if they had a case when they had no case. They cite the Lawrence case. If the court wants to hear about Lawrence I'd ask a chance to brief it. I don't see it in their briefs. That's the one case they say where some doctor is held. Where's the Lawrence case? From the 10th Circuit. They cited two non-precedential cases in their brief and they don't stand for any proposition to change the law that was pretty clearly explained by the Supreme Court in Santos. So what I would ask the court to do is to look first with money laundering to the concept of proceeds. They didn't even prove the first thing that those $250 were proceeds. Thank you, Your Honor. Thank you, Mr. Kluge. Thank you. We noticed that both you and Ms. Golder were court appointed. Thank you for accepting the appointment and helping us.